In re Shearn MOODY, Jr., Debtor.

W. Steve SMITH, Trustee, Plaintiff,

v.

Shearn MOODY, Jr., Debtor, Defendant.

Civ. A. No. H–86–3947.

United States District Court, S.D. Texas, Houston Division.

Aug. 11, 1987.

See also, D.C., 77 B.R. 580.

Ben Floyd, Bonham, Carrington & Fox, Houston, Tex., for Trustee W. Steve Smith.

Martin Paul Solomon, New York City, David C. Unger, Houston, Tex., for defendant.

Robert C. Maley, Jr., Sheinfeld, Maley & Kay, Houston, Tex., for intervenor, receiver of Empire Life Ins. Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CARL O. BUE, Jr., District Judge.

The perplexing issue before the Court concerns the extent to which property that a debtor purports to designate as his homestead under Texas exemption laws may be set aside by the Trustee in bankruptcy as the subject of voidable fraudulent conveyances under the bankruptcy code. For the reasons set forth below, the Court concludes that on the facts of this case, the remedies requested by the Trustee run afoul of the Texas Constitutional protection afforded a homestead and may not properly be awarded to the Trustee and Intervenor.

### Findings of Fact

A stipulation of facts was initially presented to the Court. The Court has adopted the stipulation and subsequent to finding of fact number 40, the Court has made further findings.

1. At all times material hereto, Defendant was the sole shareholder of Shearn Moody Holding Company ("SMHC"). Accordingly, all of the shares of stock of SMHC were property of Defendant's bankruptcy estate.

2. At all times material hereto, Defendant was also an officer and director of SMHC.

3. Prior to the incorporation of SMHC, the Defendant acquired approximately 575 acres of real property on the western end of Galveston Island in three, or possibly four, separate transactions. The Defendant acquired the bulk of the property from Robert I. Cohen, Inc. by Deed dated and recorded May 6, 1960 (Exhibit 1). This transaction was partly for cash and partly financed by Trust 42A for the Defendant's benefit. In May of 1972, when the Defendant became of age pursuant to the terms of Trust 42A, each of the three trustees executed warranty deeds conveying the tracts of land acquired from Robert I. Cohen, Inc. to the Defendant (Exhibits 9, 10 and 11). The Defendant acquired another portion of the tract from B. Wittjen and Gaddis Wittjen by Deed dated July 21, 1967 (Exhibit 7). The Defendant acquired another portion of the tract from National Western Life Insurance Company after the Defendant paid off an investment made by the Defendant and others following the default of the other investors. This was accomplished by Deed dated December 29, 1969 (Exhibits 2, 3, 4, 5 and 6). Finally, the Defendant acquired a portion of the tract from Robert I. Cohen's aunt, Mrs. Gladys C. Blum. Joe Max Taylor acquired the property from Mrs. Gladys C. Blum, and subsequently deeded it to the Defendant on April 24, 1970 (Exhibit 8).

4. In 1972, the Defendant's privately chartered bank, W.L. Moody (Unincorporated) & Co. Bankers, was placed in receivership by the Securities and Exchange Commission. Members of the Defendant's family advanced funds necessary to pay off the depositors. To secure these advances, the Defendant gave a mortgage on the entire tract of land to these members of his family (Exhibit 12). As the assets of W.L. Moody were liquidated, the monies advanced to pay off the depositors were repaid to these members of Defendant's family.

5. On January 5, 1973, SMHC was incorporated by the Defendant's brother, Robert L. Moody, acting pursuant to a Power of Attorney granted to him by the Defendant during the Defendant's illness.

6. Part of the capitalization of SMHC came from assets remaining after the dissolution of another one of Defendant's life insurance companies, Empire State Life Insurance Company. The policies of insurance of Empire State Life Insurance Company were reinsured by a life insurance company belonging to Robert L. Moody, National Western Life Insurance Company ("National Western"). The remaining assets after dissolution were transferred to SMHC. Among the assets transferred were three-fifths (⅗ths) of one-eighth (⅛th) life estate interest in the Libby Shearn Moody Trust ("Trust 57").

7. On August 1, 1973, there remained due and owing to the Defendant's family members the sum of Nine Hundred Twenty-Three Thousand, Seven Hundred Thirteen and 75/100 Dollars—($923,713.75). On that date, Defendant executed a promissory note made payable to National Western in that amount for a loan which was used to pay off Defendant's family members (Exhibit 47). To secure this transaction, the Defendant executed a deed of trust (the "mortgage to National Western" or the "National Western Mortgage") on the following described real estate to National Western (Exhibit 17):

TRACT NO. 1:

Lots 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 25, 26, 27, 28, 29, 32, 33, 34, 35, 36, 45 and 46 in Section No. 2, Trimble & Lindsey Survey, Galveston Island, Galveston County, Texas, and Lots 93, 437, 446, 447, 454, 455, 456, 457, 466, 467, 468, 469, 474, 475, 476, 477, 481, 486, 487, 489, 494, 495, 496 and 497 in Section No. 1, Trimble & Lindsey Survey, Galveston Island, Galveston County, Texas.

That portion of all unopened and previously dedicated County roadways which

have heretofore, by appropriate action of the County Court of Galveston County, Texas, been abandoned, which lie between or which are contiguous to the lots in Section No. 1 and No. 2, Trimble & Lindsey Survey, Galveston Island, Galveston County, Texas.

TRACT NO. 2:

Lot 473 and the South 1515.13 feet of the West 230 feet of Lot 470, Section 1, Trimble & Lindsey Survey, Galveston Island, Galveston County, Texas.

TRACT NO. 3:

The East one-half (½) of Lot 389 and the North 493.9 feet of the West 245 feet of Lot 374, Section 1, Trimble & Lindsey Survey at Galveston Island, Galveston County, Texas.

TRACT NO. 4:

The surface only of Lots 114 and 115 in Section 2, Trimble & Lindsey Survey of Galveston Island, Galveston County, Texas.

8. The Defendant excepted from the mortgage to National Western a ten acre parcel of land, generally described as a tract of land located in Lots 36, 25, 16, and 5, in Section 2 and Lots 497, 496, 486 and 487 in Section 1 in the Trimble & Lindsey Survey of Galveston Island, Galveston County, Texas (the "ten acre tract").

9. The loan from National Western was guaranteed by SMHC (Exhibit 16). To further secure the loan from National Western, SMHC collaterally assigned a life insurance policy on the Defendant's life (Exhibit 15) and a one-fifth (⅕th) of one-eighth (⅛th) life estate interest in Trust 57 (Exhibit 18).

10. Pursuant to agreements by and between National Western, SMHC, the Defendant and Moody National Bank as trustee of Trust 57 (Exhibits 14–19), the semi-annual distribution attributable to this assigned life estate interest was forwarded directly to National Western. National Western in turn would pay the semi-annual installment due on the loan, any premium due on the life insurance policy, and all ad valorem taxes on the entire tract of land owned by the Defendant. The net proceeds remaining after such payments were remitted to SMHC and distributed to the Defendant in the form of dividends.

11. At all times material hereto, all payments on the mortgage to National Western and ad valorem taxes were paid in the manner set forth in the preceding paragraph.

12. Also in 1972, the Intervenor and others filed a securities suit against the Defendant in the United States District Court for the Northern District of Texas. At all times material hereto, this litigation was pending before the United States District Court for the Northern District of Texas, the Fifth Circuit Court of Appeals and/or the United States Supreme Court.

13. The Intervenor obtained a multi-million dollar jury verdict on December 30, 1976 in the Federal District Court in the Northern District of Texas.

14. Thereafter, on January 24, 1977, the Defendant conveyed the approximate 565 acres of land described in the mortgage to SMHC by an Assumption Deed (the "1977 Assumption Deed") (Exhibit 22).

15. Additionally, on September 7, 1977, the Defendant, in his capacity as President and sole shareholder of SMHC, mortgaged the entire approximate 575 acre tract (described in Admission of Fact Numbers 7 and 8 above) to TEAC Finance Consortium in order to secure a six million dollar line of credit that was to be established (Exhibits 23–27). Although no funds were extended under the line of credit, the mortgage has not been released, and Defendant never made demand upon TEAC to release the mortgage.

16. On January 4, 1979, the Defendant executed and recorded a Designation of Homestead covering 199.56 acres (the "first homestead designation") (Exhibit 30). The first homestead designation included the 100 acre tract hereinafter described in paragraph 18.

17. On May 29, 1979, the Receiver obtained the entry of a judgment in the amount of $6,319,000.00 against the Defendant (Exhibit 43).

18. On June 27, 1979, the Defendant executed another Designation of Homestead covering one hundred acres, more or less, which was recorded on June 28, 1979 (the "second homestead designation") (Exhibit 29). The second homestead designation included the ten acre tract that was initially excepted from the mortgage to National Western. The second homestead designation recites on its face that it was to be effective only if the first homestead designation was ineffective.

19. The Defendant filed various post-judgment motions in the Intervenor's suit, which were ultimately overruled on January 9, 1980. The Defendant then filed his notice of appeal of the Intervenor's judgment on February 6, 1980.

20. Subsequent to the entry of the Intervenor's Judgment, the Defendant made a number of transfers to one James A. Stoker.

21. The Defendant executed a Warranty Deed of Gift to Mr. Stoker consisting of an undivided one-half (½) interest in the 10 acre tract included in Defendant's second homestead designation (Exhibit 36). The Warranty Deed of Gift states on its face that it was executed on October 10, 1979. However, it was not recorded until January 25, 1980, after Defendant's post-judgment motions referenced above were overruled.

22. The Defendant executed an Agreement Creating Right of Survivorship in Joint Tenancy Property in favor of Mr. Stoker on October 10, 1979, respecting the ten acre tract which also was not recorded until January 25, 1980, after the post-judgment motions were overruled (Exhibit 31).

23. On April 1, 1980, the Defendant executed a Deed of Gift-Life Estate granting Mr. Stoker a life estate in the remaining undivided one-half (½) interest in the ten acre tract which was recorded on August 11, 1980 (Exhibit 37).

24. Both the October 10, 1979 Warranty Deed of Gift and the April 1, 1980 Deed of Gift-Life Estate were subject to conditions subsequent which had not occurred as of November 14, 1983. (The conditions provided that Stoker would maintain the property as his permanent home and that he would not transfer his interest in any way or the conveyance would not be effective.)

25. On April 1, 1980, James A. Stoker executed a Designation of Rural Homestead covering the ten acre tract which was recorded on April 11, 1980 (Exhibit 34).

26. Also on April 1, 1980, the Defendant executed a Declaration of Trust conveying the ten acre tract into a trust (Exhibit 33). The Trust was not to be effective unless James A. Stoker predeceased the Defendant. An instrument attempting to revoke the trust was executed by the Defendant on May 13, 1983 (Exhibit 45). However, the revocation was not recorded until after the filing of the Defendant's initial Chapter 13 case in the Southern District of Texas.

27. Also on April 1, 1980, the Defendant executed a Warranty Deed conveying to Shearn Moody, Jr., Trustee, all oil, gas, and other minerals, and mineral interests, and all royalty interests, which Defendant then owned in any land situated in Galveston County, Texas (Exhibit 32). No independent evidence was produced to demonstrate the purpose or reason for this transaction.

28. On March 18, 1982, the Defendant executed the 1982 Assumption Deed, whereby the 565 acre tract previously conveyed to SMHC by the 1977 Assumption Deed was again conveyed and/or reconveyed to SMHC, this time less one hundred acres, as opposed to the previous reservation of ten acres. The one hundred acres that was reserved is the same property described in the second homestead designation.

29. On March 7, 1983, the Defendant, in his capacity as President and sole shareholder of SMHC, executed the 1983 Warranty Deed, conveying two hundred acres from SMHC to himself. The two hundred acres conveyed by SMHC to Defendant under the 1983 Warranty Deed included most, but not all, of the property described in the first homestead designation, some of which remained titled in SMHC.

30. On the dates of the execution and recordation of the 1982 Assumption Deed and the 1983 Warranty Deed, Defendant gave no consideration to SMHC in ex-

change for the transfers effected by the 1982 Assumption Deed and the 1983 Warranty Deed.

31. On the dates of the execution and recordation of the 1982 Assumption Deed and the 1983 Warranty Deed, the Defendant was insolvent and did not have sufficient assets within the State of Texas subject to execution to pay off his debts.

32. On the date of the execution and recordation of the 1982 Assumption Deed and 1983 Warranty Deed, Intervenor, Empire Life, Reynolds, White, Allen & Cook and Graves, Daugherty, Hearon & Moody, were creditors holding unsecured claims allowable under 11 U.S.C. § 502.

33. On March 25, 1983, the Defendant executed a Designation of Homestead (Exhibit 42) covering the two hundred acres described in the 1983 Warranty Deed which was recorded on March 29, 1983, under Clerk's File Number 8310617 (the "third homestead designation").

34. Thereafter, Defendant executed another Warranty Deed (Exhibit 41) conveying the two hundred acres described in the 1983 Warranty Deed to Shearn Moody, Jr., Trustee which was recorded on March 29, 1983, under Clerk's File Number 8310618.

35. On April 1, 1983, Defendant executed another Warranty Deed (Exhibit 43) conveying all oil, gas, or other minerals, or any mineral estate which he then owned, or might own in Galveston County, Texas to Shearn Moody, Jr., Trustee, which was recorded on April 11, 1983.

36. On May 13, 1983, the Defendant executed another Warranty Deed (Exhibit 44) conveying all the minerals owned by the Defendant in, on, or under the two hundred acres described in the 1983 Warranty Deed to Shearn Moody, Jr., Trustee, which was recorded on June 28, 1983, after the Debtor's initial Chapter 13 filing in the Southern District of Texas.

37. On June 6, 1983, the Defendant filed his original voluntary petition under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas-Houston Division.

38. The Defendant dismissed his original Chapter 13 case on November 10, 1983 and refiled another Chapter 13 case on November 14, 1983 in the United States Bankruptcy Court for the Middle District of North Carolina. It is this second case which, after conversion to Chapter 11, change of venue and withdrawal of reference, currently pends before this Court as Civil Action No. H–86–2314.

39. Defendant's second Chapter 13 petition reflected that, on November 14, 1983, Defendant resided at 3525 Mayfair, Apt. 207, Durham, North Carolina 27707 (Exhibit 49).

40. Since the execution of the National Western Mortgage, SMHC paid all of the payments of the National Western mortgage and SMHC paid all of the ad valorem taxes on the approximately 575 acre tract.

41. The 1982 Assumption Deed is an attempt by the Debtor to correct the conveyance of land previously conveyed to SMHC by the 1977 Assumption Deed.

42. No cogent evidence was presented by the Debtor justifying the purposes for the confusing and contradictory transfers of real property by the Debtor or his corporation SMHC.

43. The procedural history and record demonstrate that the transfers from SMHC to the Defendant and vice-versa were done at a time when the Intervenor Creditor was attempting to execute on the Debtor's assets.

44. The multitude of transfers were made by the Debtor or his agents acting on his requests.

45. The Debtor's conduct throughout the various land transactions described previously evidences a fraudulent intent to conceal property from execution by his primary creditor, Empire Life Insurance Co.

46. The Debtor's conduct also shows that he intended to make the two hundred acre tract designated in the second and third homestead designations his Texas homestead. The two hundred acres included in the third homestead designation are valued at a substantially greater value

than the remaining acreage which is currently property of the bankruptcy estate.

47. With the exception of his sojourn in North Carolina during an extended period of illness, the Debtor has consistently resided at 2601 Eight Mile Road, Galveston, making it his permanent residence since its purchase in the 1960's.

48. The two conveyances attacked by the Trustee and Intervenor are transfers of real property that the Debtor claims as a rural homestead exempt from the claims of a judgment creditor pursuant to the Texas Constitution.

49. The Trustee's sole purpose in this suit is to procure for the bankruptcy estate and for the creditors the benefit of the approximately two hundred acres which the Debtor claims as his homestead.

50. Objections by the Intervenor and the Trustee to the Debtor's claimed homestead exemptions are currently the subject of another proceeding, H–86–2314. Therefore, the precise extent to which the Debtor is entitled to a homestead has yet to be decided.

### Conclusions of Law

1. Jurisdiction is uncontested and exists by virtue of the withdrawal of reference from the bankruptcy court in Debtor's Chapter 11 proceeding in Civil Action H–86–2314 pursuant to 28 U.S.C. § 157 and 1334, 11 U.S.C. § 544 and 548.

### Fraudulent Conveyances

2. The Bankruptcy Code provides in § 548(a)(2) that the Trustee may avoid an interest of the Debtor in property that was made or incurred on or within one year before the date of the filing of the petition if the Debtor voluntarily or involuntarily (A) received less than a reasonably equivalent value in exchange for such transfer; and (B) was insolvent on the date that such transfer was made.

3. At first glance, the March 7, 1983 Warranty Deed falls within the statute. The Debtor's Chapter 13 petition was filed in North Carolina on November 14, 1983. Therefore, the transfer was made within one year before the filing date. The Debtor, however, argues that the purpose of the fraudulent conveyance statutes is to avoid transfers by the Debtor to another, technically, "out from the debtor," and therefore, because the March 7, 1983, Warranty Deed conveyed land from SMHC to the Debtor, the statute is inapplicable. While this reasoning possesses some technical validity, it essentially places form above substance. The bankruptcy code defines the term "transfer" broadly. 11 U.S.C. § 101(48) defines transfer as every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the Debtor's equity of redemption.

Based on the facts and circumstances in this case, the transfer of property from SMHC to the Debtor initially falls within the fraudulent conveyance statute. The Court may also disregard the corporate entity of SMHC where it is apparent that SMHC was merely used as a conduit to enable the Defendant to transfer the property. *Rudin v. Steinbugler*, 103 F.2d 323 (2d Cir.1939); *Irving Trust Co. v. Kaminsky*, 22 F.Supp. 362 (S.D.N.Y.1937); *Merriam v. Venida Blouse Corporation*, 23 F.Supp. 659 (S.D.N.Y.1938). *Bush v. Gaffney*, 84 S.W.2d 759 (Tex.Civ.App.—San Antonio 1935, no writ).

4. Section 548(a)(1) permits the Plaintiff to avoid any transfer of an interest of the Debtor in property that was made in or within one year before the date of the filing of the petition if the Debtor voluntarily or involuntarily made such transfer with actual intent to hinder, delay, or defraud any entity to which the Debtor was or became indebted on or after the date that such transfer was made.

5. Under Section 548, fraudulent intent may be inferred from facts and circumstances in the record pointing to the conclusion that the Debtor's actions were motivated by intent to hinder, delay or defraud creditors. *See, e.g., In the Matter of Life Science Church of Riverpart*, 34 B.R. 529 (Bankr.N.D.Ind.1983); *In the Matter of*

*Commercial Candy Company,* 20 B.R. 292 (Bankr.W.D.Mo.1982). The pendency of a lawsuit or an actual judgment held by a creditor is another indication that actual fraud is present. *In re Kaiser,* 722 F.2d 1574 (2d Cir.1983).

6. The record is replete with indicia of fraud. The intervenor's judgment became final on May 29, 1979 after the judgment was affirmed by the Fifth Circuit and the Supreme Court. The March 7, 1983 warranty deed was executed approximately two months prior to the Defendant's initial Chapter 13 filing in the Southern District of Texas in June 1983. The transfer was made therefore in contemplation of bankruptcy with the intent to hinder execution of the judgment held by the Intervenor.

7. The Court takes judicial notice of the Findings of Fact and Conclusions of Law of the Bankruptcy Court entered on September 13, 1985 in which the Hon. Letitia Taitte Clark found that numerous transfers including the 1983 Warranty Deed appeared to have been done without any business or rational purpose and appeared to have been designed for the sole purpose of placing assets beyond the reach of the Defendant's creditors. Findings of Fact 78–82.

8. Plaintiff relies on 11 U.S.C. § 544 as an alternative to set aside the two conveyances. Under that section, the Trustee may avoid any transfer of an interest of the Debtor in property that is voidable by applicable law by a creditor holding an unsecured claim. Applicable state law is incorporated into § 544.

9. Sections 24.02 and 24.03 of the Texas Business and Commerce Code are similar to 11 U.S.C. § 548(a)(1), providing that a transfer is void if it is intended to delay, hinder or defraud a creditor. Similar "badges of fraud" indicate the existence of fraudulent intent. *See, e.g., Texas Sand Co. v. Shield,* 381 S.W.2d 48 (Tex. 1964) (existence of pending suit at time of transfer); *Kemp v. Metropolitan Life Ins. Co.,* 205 F.2d 857 (5th Cir.1953) (conveyances without consideration are presumptively fraudulent).

10. The Trustee is not entitled to recover monetary damages against Moody for the alleged fraudulent transfers pursuant to Tex.Bus.Com. Code Ann. §§ 24.02, 24.03 (Vernon 1968). Under the Texas fraudulent conveyance statute, the remedy afforded a successful claimant relates entirely to the Debtor's fraudulently transferred property and entails no personal liability on the part of those responsible for the transfer. *In re Mortgage America Corp.,* 714 F.2d 1266, 1272 (5th Cir.1983).

11. To the extent that the Trustee attempts to set aside the 1982 Assumption Deed pursuant to 11 U.S.C. § 548(a)(1), the transfer may not be attacked because the conveyance occurred on March 18, 1982, more than a year prior to the filing of the bankruptcy petition. More importantly, neither conveyance may be set aside under any of the statutes relied on by the trustee. As the Court will discuss more fully later in this order, conveyances of homestead property are not fraudulent as to creditors and may not be attacked by a judgment creditor or a bankruptcy trustee.

## STATUTE OF LIMITATIONS

12. The Defendant argues that the Plaintiff's claims are barred by the statute of limitations. 11 U.S.C. § 546(a) governs the statute of limitations in a suit to avoid fraudulent conveyances. That section provides:

> An action or proceeding under Section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—
>
> (1) two years after the appointment of a trustee under Section 702, 1104, 1163 or 1302 of this title; or
>
> (2) the time the case is closed or dismissed.

11 U.S.C. § 546(a).

The Defendant argues that the two year time period commenced on November 14, 1983 when a trustee was appointed in the Chapter 13 case rather than on October 26, 1984 when a Chapter 11 Trustee was appointed in North Carolina. This suit was filed on October 16, 1986, and would be untimely if the statute ran from the appointment of the Chapter 13 Trustee.

Firm policy considerations and case law preclude dismissal of this case on a statute of limitations basis where concealment of assets and questionable transactions run rampant throughout the record. In a scholarly and well reasoned opinion, the Hon. Glen E. Clark held that the statute of limitations contained in 11 U.S.C. § 546(a) provides each trustee appointed under Chapter 7, 11 or 13 two years within which to commence avoidance actions. *In re AFCO Development Corp.*, 65 B.R. 781 (Bankr.D.Utah 1986).

The Court noted that while statutes of limitations are intended "to deter would be plaintiffs from sleeping on their rights." *See, Crown Cork & Seal Co. v. Parker*, 462 U.S. 345, 342, 103 S.Ct. 2392, 2396, 76 L.Ed.2d 628 (1983), such considerations become somewhat attenuated in a bankruptcy context. Preference and avoidance litigation entail uncertainty because a Chapter 11 case may remain open for many years before conversion to Chapter 7. 65 B.R. at 785.

The Court pointed out that the functions of a Chapter 13 Trustee are primarily administrative in nature and seldom exercise avoiding powers for the estate. *See, In re Ciavarella*, 28 B.R. 823 (Bankr.S.D.N.Y. 1983); *In re Walls*, 17 B.R. 701 (Bankr.S.D. W.Va.1982). If the Chapter 13 trustee failed to exercise the avoiding powers, a subsequent trustee and creditors would be seriously prejudiced in a superseding Chapter 7 case. 65 B.R. at 787.

13. *In re AFCO, supra,* is easily applicable to this case. The multifarious actions of the Debtor and his agents have resulted in one of the most protracted and complex Chapter 11 proceedings in bankruptcy history. The Court takes judicial notice of the record in H–86–2314 and the many instances of fraudulent concealment observed by the two bankruptcy courts that presided over this case prior to the withdrawal of reference. To preclude the Chapter 11 trustee from attempting to set aside these transactions based solely on a limitations argument flies in the face of equity and law as enunciated in *In re AFCO.* This action is therefore timely under 11 U.S.C. § 546(a).

## COLLATERAL ATTACKS

14. The Defendant also argues that this lawsuit to set aside fraudulent conveyances is actually a collateral attack on Moody's claimed homestead exemption and is therefore untimely under Federal Rule of Bankruptcy Procedure 4003(b) which requires that objections to property excluded as exempt must be filed within 30 days after the conclusion of the meeting of creditors unless, prior to the expiration of the 30 day period, the Court extends the time. Moody claims that because this adversary proceeding was not commenced until October 16, 1986, two years after the creditor's meeting, it should be dismissed as an untimely collateral attack upon Moody's designation of exempt real property. *See, e.g., Matter of Weisner,* 39 B.R. 963 (Bankr.W.D.Wis.1984) (Trustee's application for appraisal of property claimed by debtor as exemptions and barred due to Trustee's failure to timely object); and *In re Walsh,* 5 B.R. 239 (Bankr.D.C.1980).

The trustee, however, correctly adopted in writing the timely filed objection to the claimed homestead exemption of the intervenor. *In re Keyworth,* 47 B.R. 966, 970 (D.Colo.1985) (trustee who failed to file timely objections allowed to join in objections timely filed by a creditor), *cf. In re Floyd,* 37 B.R. 890 (Bankr.N.D.Tex.1984) (creditors not permitted to "piggy-back" on a motion to extend time to file a complaint to deny discharge filed by another creditor where each complaint involved a separate debt); and *In re Kasishke,* 40 B.R. 712, 714 (Bankr.N.D.Tex.1984) (Anti-"piggyback" rule adopted to prevent trustee who orally objected to debtor's exemptions but failed to timely file written objection from filing a complaint to deny discharge. The Court, however, noted that debtor's actions in selling home before homestead exemptions were determined did not merit the relief sought by the trustee).

15. The Court declines to routinely apply the anti-piggyback rule that the Debtor urges. Again, the record demonstrates the

Debtor's utter lack of cooperation with the Trustee from the onset. To preclude the Trustee from adopting the Intervenor's timely objection requires that the Court ignore the deception and concealment apparent in the case. The Court notes, however, that the anti-piggy back argument is more appropriately made in the C.A. H–86–2314 where the objection to Moody's claimed homestead exemption pends.

16. Although the record demonstrates sufficient evidence for the Court to conclude at first blush that the conveyances fall within the fraudulent conveyance statutes cited by the Trustee because the conveyances include homestead property, they are not fraudulent as to creditors. For the reasons set forth below, the Trustee and Intervenor may not set aside these transactions as fraudulent conveyances, nor may the Plaintiffs impose an equitable lien or constructive trust on property claimed as homestead under Texas Law.

### The Texas Homestead Exemption

17. The Trustee seeks rescission of the two deeds, the 1982 Assumption deed and the 1983 deed from SMHC to Moody based on a finding of fraud, and the imposition of an equitable lien and a constructive trust on the property covered by the two deeds. The practical effect of the remedies sought would be to re-vest title to the land in SMHC, now known as BOI which has been determined to be property of the bankruptcy estate by Bankruptcy Judge Clark. The Debtor argues, however, that the remedies sought by the Trustee are barred by the Texas constitutional protection afforded to a homestead.

The Debtor also asserts that this entire cause of action represents in actuality a collateral attack on Moody's claimed homestead exemption. To the extent that the Trustee seeks to divest Moody directly of any homestead interest he may be entitled to, the Debtor's argument is meritorious. However, merely because the subject deeds involve land designated as homestead does not entirely bar the Trustee's claim prior to trial. Sufficient questions of fact existed and the Trustee was properly permitted to present evidence of the alleged fraudulent transfers to demonstrate the estate's entitlement to relief, if at all.

18. In Texas, a homestead is defined and prescribed by Article XVI, § 51 of the Texas Constitution, which provides:

The homestead, not in a town or city, shall consist of not more than two hundred acres of land, which may be in one or more parcels, with the improvements thereon; the homestead in a city, town or village shall consist of a lot or lots amounting to not more than one acre of land, together with any improvements on the land.

19. Article XVI § 50 goes on to provide that no mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money. Article XVI § 50 prohibits the forced sale of a homestead for any purpose other than purchase money liens, improvement liens or taxes. Tex.Const. Art. XVI § 50.[1]

20. Under Texas law, land properly claimed as homestead is exempt from execution by judgment creditors, and a debtor may convey homestead property free and clear of judgment liens. *Englander v. Kennedy*, 424 S.W.2d 305 (Tex.Civ.App.—Dallas) writ ref'd n.r.e., 428 S.W.2d 806 (Tex.1968).

21. The provisions of the bankruptcy code contained within 11 U.S.C. § 541 provide that upon commencement of a case, all property of the debtor becomes property of the estate. However, once the debtor's

---

**1.** The relevant portion of Article § 50 of the Texas Constitution states:

"The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for the purchase money thereof, or a part of such purchase money, the taxes due thereon, or for work and material used in constructing improvements thereon, and in

this last case only when the work and material are contracted for in writing, with the consent of both spouses, in the case of a family homestead, given in the same manner as is required in making a sale and conveyance of the homestead ... No mortgage shall ever be valid, except for the purchase money therefor, or improvements made thereon, as hereinbefore provided...."

property becomes property of the estate, the debtor is entitled to exempt certain property. *In re Graham*, 64 B.R. 469 (Bankr.S.D.Tex.1986).

22. The Trustee relies upon *In re Kasishke, supra,* arguing that fraudulent transfers of real property may be set aside because Moody's homestead has not yet been determined, and therefore he does not have a valid allowed exemption. *In re Kasishke* does not support the Trustee's contention. The debtors in *Kasishke* sold a residence which was claimed as homestead prior to the time a ruling was rendered on an objection to the exemption. The Court held that the debtor had no power to transfer the property without the approval of the trustee and could not "jump the gun" and dispose of exempt property after the case was filed but prior to the time the exempt property had been removed from "property of the estate." Under 11 U.S.C. § 362, the Court held the debtors in contempt and ordered them to pay the trustee attorney fees in the sum of $350. The trustee also sought to deny the debtors discharge because of the transfer. The Court refused the requested relief, determining it to be too drastic under the rather inconsequential circumstances of the case. 40 B.R. at 714.

The Bankruptcy Court in *Kasishke* clearly did not hold that the debtors were not entitled to the homestead exemption because the objection had not been ruled on yet when the transfer was made. In fact, the Court explicitly referred to the property as exempt property in spite of the fact that the objection had not been ruled on. 40 B.R. at 714. The Trustee is not entitled to rely on *Kasishke* to effectively nullify the Debtor's claim that the property is subject to a homestead exemption.

23. Sitting as a court of equity, this Court has no power to deprive an individual of valid existing legal rights.

24. 11 U.S.C. § 522 provides that an individual debtor may exempt property from the bankruptcy estate that is applicable under the relevant state, federal or local law.

25. In Texas, liberal views prevail with respect to exemption claims. *Meritz v. Palmer*, 266 F.2d 265 (5th Cir.1959).

26. A debtor has a right to a prompt determination of his exemptions. *In re Hilmoe*, 56 B.R. 262 (Bankr.D.S.D.1985); *In re Waters*, 22 B.R. 387 (Bankr.N.D.Tex. 1982).

27. The Trustee may not take advantage of the delays and inefficiencies that resulted from the bankruptcy court's crowded docket by arguing that the Debtor's homestead exemption has not yet been allowed when this Court will shortly rule on the question. Nor may the Trustee rely upon the complexity of the case to employ this argument as a tactical maneuver to preclude determination of Moody's exemptions.

28. Assuming therefore for the purposes of this proceeding only that Moody is entitled to claim some portion of the deeded acreage as his Texas homestead, the Court concludes that the Trustee may not enforce an equitable lien on the claimed homestead property in spite of the fact that Moody's machinations may have been prompted by the desire to remove his assets from execution by creditors.

29. Texas courts strongly disapprove of the imposition of equitable liens and constructive trusts on homestead property where constitutional and statutory requirements for imposing liens on homestead property are not complied with.[2] *Matter of Daves*, 770 F.2d 1363 (5th Cir.1985)

---

2. The Texas Property Code sets forth the procedure to be followed for the valid imposition of a lien on homestead property. § 53.059 provides:
   (a) To fix the lien on a homestead, the person who is to furnish or perform labor and the owner must execute a written contract setting forth the terms of the agreement.
   (b) The contract must be entered before the material is performed.
   (c) If the owner is married, the contract must be signed by both spouses.
   (d) The contract must be filed with the county clerk of the county in which the homestead is located, who shall record it in records kept for that purpose.
   (e) If the contract is made and recorded by an original contractor, the contract inures to

30. Under narrowly limited circumstances, Texas Courts will impose an equitable lien against homestead property. The rationale for imposing and enforcing an equitable lien against any property, including a homestead, is that an entity from whom the funds were wrongfully taken has a pre-existing interest in the homestead. This is so because the property taken never belonged to the wrongdoers. *Baucum v. Texam Oil Corp.,* 423 S.W.2d 434 (Tex.Civ.App.—El Paso 1968, writ ref'd n.r.e.). The equitable lien arises at the moment the funds are wrongfully taken, as the funds are already subject to a constructive trust at the time they are used to purchase the homestead or improvements thereon. *In re Lodek,* 61 B.R. 66 (Bankr. W.D.Tex.1986).

31. In deciding whether to impose an equitable lien on homestead property, Texas courts distinguish between homesteads acquired with fraudulently obtained moneys and those that are merely augmented or improved with wrongfully acquired funds. In the former case, a constructive trust or equitable lien will be imposed because the constructive trust is initially declared to exist on the stolen funds, and the trust property may be traced in its mutations to property purchased with the stolen funds, provided that the property can be identified and is not a previously existing homestead. *Bush v. Gaffney,* 84 S.W.2d 759 (Tex.Civ.App.—San Antonio 1935, no writ); *Meyers v. Baylor University,* 6 S.W.2d 393 (Tex.Civ.App.—Dallas 1928, writ ref'd); *First State Bank of Ellinger v. Zelesky,* 262 S.W. 190 (Tex.Civ.App.— Galveston 1924, no writ); *Smith v. Green,* 243 S.W. 1006 (Tex.Civ.App.—Amarillo 1922, writ ref'd); *Baucum v. Texam Oil Corporation,* 423 S.W.2d 434 (Tex.Civ.App. —El Paso 1968, writ ref'd n.r.e.); *Maryland Casualty v. Shroeder,* 446 S.W.2d 117 (Tex.Civ.App.—El Paso 1969, writ ref'd n.r. e.).

32. However, where stolen or fraudulently acquired funds are used to enhance an existing homestead, an equitable lien on the homestead will not be enforced. *Curtis Sharp Custom Homes Inc. v. Glover,* 701 S.W.2d 24 (Tex.App.—Dallas 1985, writ ref'd n.r.e.) (Constitutional provision prohibiting forced sale of a homestead prevented foreclosure of an equitable lien on property where funds embezzled from an employer were used to pay for improvements to the homestead).

33. Texas law is well settled that the disposition of property subject to execution for the purpose of procuring a homestead is not deemed a fraud upon creditors. *Swayne v. Chase,* 88 Tex. 218, 30 S.W. 1049 (1895); *Finn v. Krut,* 13 Tex.Civ.App. 36, 34 S.W. 1013 (1896); *Bell v. Beazley,* 18 Tex.Civ.App. 639, 45 S.W. 401 (1898); *Southern Irr. Co. v. Wharton Nat'l Bank,* 144 S.W. 701 (Tex.Civ.App. 1912); *Van Wagner v. Kruse,* 221 S.W.2d 787 (Tex.Civ. App.—Eastland 1949, no writ).

34. Under the Texas statutes relating to fraud and fraudulent conveyances, a Texas debtor who is entitled to a homestead and a homestead exemption can appropriate all or part of his property to purchase a homestead, and his creditors cannot prevent his doing so, even though such action is for the purpose of and results in hindering, delaying and defrauding his creditors. *National Liberty Ins. Co. of America v. Merkur,* 29 F.Supp. 280 (S.D.Tex.1939).

35. As a general rule, to invalidate a gift or other voluntary conveyance as fraudulent, the property must be of a kind to which a creditor can resort for payment of his debts, and creditors cannot complain of transfer of property immune from seizure. *Citizens Nat. Bank at Brownwood v. Turner,* 89 F.2d 600 (5th Cir.1937); *Chandler v. Welborn,* 156 Tex. 312, 294 S.W.2d 801 (1956).

36. Where the sole purpose of a conveyance of exempt homestead property is to defraud creditors or place the land beyond their reach, a judgment creditor may not set aside the conveyance or foreclose upon a lien on the property. *Van Wagner v. Kruse,* 221 S.W.2d 787 (Tex.Civ.App.— Eastland 1949, no writ) (where business

the benefit of all persons who labor or furnish material for the original contractor.

Texas Property Code (West 1984)

homestead was conveyed from two husbands to two wives for the purpose of defrauding creditors, property was not subject to the husbands' debts); and *see, Crow v. First Nat. Bank of Whitney*, 64 S.W.2d 377 (Tex.Civ.App.—Waco 1933, writ ref'd) (where wife conveyed her homestead interest to her son, creditor could not set aside the conveyance to satisfy the wife's debt).

37. The Fifth Circuit has more recently noted that Texas constitutional and statutory protection of the homestead is absolute, and the exemption may be allowed in full regardless of a debtor's intent. *In re Reed*, 700 F.2d 986 (5th Cir.1983) (hereafter Reed III).

38. The *Reed* series of cases, relied on by all parties is the subject of some confusion. In *Reed*, the debtor openly converted non-exempt assets, including a coin collection, guns, antiques and an interest in a corporation into cash for less than their actual value during a two week period prior to filing a Chapter 7 petition. The debtors used the cash to pay for improvements on their residence, pay an improvement loan and reduce the balance on a vendor's lien on the residence. *In re Reed*, 12 B.R. 41 (Bankr.N.D.Tex.1981) ("Reed I"). In *Reed I*, the trustee filed a complaint challenging the debtor's right to claim a homestead exemption due to the conversion of assets. The bankruptcy court denied the trustee's challenge to the homestead exemptions on the basis that the prohibition against forced sale of a homestead in the Texas Constitution precluded relief.

In *Reed II*, the bankruptcy court held that the conversion of non-exempt assets warranted the denial of discharge of all of Reed's dischargeable debts. 11 B.R. 689 (Bankr.N.D.Tex.1981). The District Court and the Fifth Circuit affirmed the debtor's denial of discharge on that basis. In *Reed III*, the Fifth Circuit, while ruling that a discharge was proper, used strong language to infer that although fraudulent intent was present, the homestead exemption could not be defeated by the eleventh hour conversion. 700 F.2d at 990.

In a footnote, the Court observed that the allowance of the exemption was not challenged, and as a result, the question of whether the exemption would be denied to property acquired with the intention of defrauding creditors did not need to be determined. 700 F.2d 986, 991 n. 2.

39. *Reed III* is a clear warning that homestead exemptions will not be lightly construed. Although the Court appears to leave open the question of whether the homestead exemption would be allowed under Texas law where the purpose of its acquisition is to defraud creditors, the Texas authorities previously cited support the conclusion that any exemption Moody may be entitled to must be allowed free and clear of an equitable lien under these facts.

40. As the Court has previously noted, Moody acquired the property at 2601 Eight Mile Road in the 1960's with the intention of making the residence his permanent residence. Although Moody participated in the questionable and contradictory conveyances noted in the Findings of Fact, which he used to designate a homestead, no evidence was produced to demonstrate that Moody claimed a homestead elsewhere.

41. Under Texas law, to establish homestead rights, overt acts of homestead usage and intention to claim the land as homestead must be demonstrated. *Lifemark Corp. v. Merritt*, 655 S.W.2d 310 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.); *Sims v. Beeson*, 545 S.W.2d 262 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.); *Prince v. North State Bank*, 484 S.W.2d 405 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.).

42. Although the question of Moody's intent to maintain a homestead is the subject of C.A. No. H–86–2314, the Court finds that Moody intended to make the property his primary residence when the land was acquired in the 1960's.

43. Although the 1983 Warranty Deed purports to deed the two hundred acres to Moody, in reality, Moody had already acquired the land in 1964, at a time when no evidence was produced to demonstrate that the land was acquired to defraud creditors. No evidence was presented to demonstrate that the designated homestead property was initially acquired with stolen funds.

Accordingly, Texas law will not support the imposition of a constructive trust or equitable lien under these circumstances.

44. The purpose behind the purported re-conveyance under the 1982 Assumption Deed and the conveyance to Moody under the 1983 Warranty Deed was to attempt to enable Moody to designate a homestead on the reconveyed acreage. Applying the line of Texas cases previously discussed, the Trustee and Intervenor may not set aside these conveyances or foreclose upon an equitable lien on the property.

### Denuding of Corporate Assets and Corporate Mismanagement

45. The Trustee seeks damages against Moody on the basis that as sole shareholder, officer and director of SMHC, Moody owed a fiduciary duty to SMHC which was breached when the 1982 and 1983 conveyances were made without consideration and without any justifiable business purpose. The Trustee claims that Moody's actions constitute waste and denuding of the corporate assets of SMHC.

The rationale behind the denuding theory is that a corporation cannot disable itself from responding for its debts by distributing its assets among its shareholders, leaving without remedies those having valid claims. Under those circumstances, a creditor injured by the distribution of assets may proceed by an appropriate suit against the stockholders to enforce payment of its claims against the corporation. *A.R. Clark Investment Co. v. Green,* 375 S.W.2d 425 (Tex.1964); *World Broadcasting System, Inc. v. Bass,* 160 Tex. 261, 328 S.W.2d 863 (1959); *Inesco Inc. v. Sears,* 567 S.W.2d 827 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.).

46. A cause of action under the Texas corporate denuding theory, though usually brought by creditors, is an action in the right of the corporation, which is brought for the benefit of all creditors and shareholders. *In re Mortgage America Corp.,* 714 F.2d 1266, 1277 (5th Cir.1983).

47. Despite the fact that the action under normal circumstances is frequently not brought by the corporation itself, the courts have uniformly held that, upon bankruptcy, it passes to the trustee who is then charged with prosecuting it for the benefit of all creditors and shareholders. *In re Mortgage America Corp., supra* at 1276, *citing* 4 Collier on Bankruptcy § 541.-10[8] (15th ed. 1983); *Holahan v. Henderson,* 394 F.2d 177 (5th Cir.), *cert. denied,* 393 U.S. 848, 89 S.Ct. 136, 21 L.Ed.2d 119 (1968).

48. The Trustee, however, has failed to demonstrate his entitlement to prevail in such a cause of action. Assuming the Trustee is proceeding under 11 U.S.C. § 544(b), the Trustee is vested with the status of an unsecured creditor of the debtor, Moody, not of SMHC. The Trustee has failed to demonstrate that any unsecured creditor of Moody would have such a cause of action against SMHC, and therefore the Trustee has no standing to maintain this claim. Even assuming that Empire Life Insurance Co., the major creditor in this case, had a claim against SMHC, the Court will not speculate and form counsel's theories where no evidence was presented to the Court to support a denuding theory.

49. The Trustee also sues on a derivative basis for mismanagement of SMHC, on the ground that he has succeeded to 100% ownership of the stock of SMHC and may bring stockholder's claims incident to the ownership. It is not clear to the Court on what basis the Trustee relies; however, 11 U.S.C. § 541 permits such a claim because the bankruptcy estate has succeeded to Moody's interest in the SMHC stock, and to causes of action incident to the stock ownership. *Matter of Consolidated Bancshares, Inc.,* 785 F.2d 1249 (5th Cir.1986).

50. The Trustee has failed to present evidence that Moody as sole shareholder of SMHC has any valid claim against SMHC that the estate may recover. In fact no evidence whatsoever was presented concerning the business dealings of SMHC and how Moody's actions as president and sole shareholder of SMHC damaged Moody individually.

51. To the extent a legal or equitable interest of a debtor in property is limited in the debtor's hands, it is equally limited in the hands of the trustee; Bankruptcy Code 11 U.S.C. § 541(a) does not vest the trustee with any greater property rights than a debtor holds at the time a petition is filed. *In re Joliet-Will County Community Action Agency,* 58 B.R. 973 (Bankr.N.D. Ill. 1986); *In re Intercontinental Sec. Corp.,* 62 B.R. 16 (Bankr.N.D.Ill.1986).

52. The Trustee may not therefore recover on a corporate mismanagement claim where Moody himself would not be entitled to bring suit. *See generally, Bangor Punta Operations v. Bangor & A.R. Co.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974) for a discussion of the equitable doctrine that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transactions.

53. With regard to any damages suffered by SMHC as a result of the transfers, the Trustee has failed to demonstrate that SMHC suffered any actual damages as a result of the conveyances.

54. Finally, the Trustee has not vigilantly pursued the corporate claims. For this and the reasons discussed, the Court declines to award the Trustee damages for the corporate theories propounded.

55. To the extent that any of the Findings of Fact are considered to be Conclusions of Law, they are adopted as such. To the extent that any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

## CONCLUSION

56. The factual record contained in Moody's Chapter 11 bankruptcy is unsavory and paints an unprecedented picture of concealment, property manipulation, waste and fraud to preserve assets. The Court, however, is reluctantly constrained to deny the Trustee and Intervenor the remedies sought. While the conduct of Moody and his agents borders on the scandalous, Texas law simply does not support setting aside conveyances of lawfully procured property where the purpose of the conveyances is to designate a homestead protected by the Texas Constitution. The appropriate remedy for Moody's conduct is to consider the denial of discharge of all debts in bankruptcy at the appropriate time, rather than to grant the imposition of an equitable lien on property claimed as homestead in this suit.

Accordingly, the Plaintiff's request for relief is denied.